Thank you for your patience. Please proceed, Counsel. Good morning, Your Honor. My name is William Messinger. I represent Appellant Dan Clark and ten other four hired drivers. I'd like to reserve four minutes for rebuttal, please. Keep an eye on it, Clark. We'll try to help you. Thank you, Your Honor. The National Labor Relations Act preempts state and local laws that regulate conduct that are either arguably permitted or arguably prohibited by Section 8B-4 and Section 80 of the National Labor Relations Act. The ordinance is preempted because it regulates what's really the archetype of conduct regulated by law. Before you get too far on this, I want to be sure of the scope of what we're covering. Are you arguing that there's a facial problem here, or is this an ad applied challenge to the ordinance? It's both, Your Honor. It's both. Both as applied with respect to Teamsters Local 117's intent to organize the drivers, but also as a facial matter with respect to any other organization that attempts to enforce the statute against the drivers. Okay. And so the ordinance regulates what's really the archetype of conduct regulated by Section 8B-4 and Section 80, which is a union campaign to coerce an employer to agree to only do business with contractors who the union represents and who are subject to the union's contract. And the citations actually from both sides make that relatively clear. So the drivers, of course, we cite about two dozen cases in which this Court and the Board have held similar types of union conduct to be illegal under 8B-4 or 8E, which includes 11 cases that involve Teamster campaigns against independent contractor drivers. Counsel, what are the driver's injuries in this case? And what's under the Davis case, what's real, immediate, and direct to your clients? The most immediate, Your Honor, is the Section 8B-4 campaign. They have a right as independent contractors not to be subjective to a coercive campaign under Section 8B-4 in which a union attempts to coerce a secondary party, in this case Uber and Lyft, to impose the union upon them. Well, what is the primary conflict here? Otherwise, in order to have a secondary, you have to have a primary. So what is the primary boycott situation? Well, what would be primary here would be the union vis-à-vis the drivers. So I'm sorry, if you're looking at who is the primary here and who is the secondary party, the drivers are the primary party, Uber and Lyft are the secondary party. So the union, through the ordinance, is attempting to pressure Uber and Lyft, through the ordinance, to in turn impose union representation on all of the drivers who are the primary in the analysis under Section 8B-4 and Section 8E. Now, two of your clients do not qualify under the ordinance. How are they injured? Because the result of the card check certification will be equally applicable to them. So they're not entitled to vote, so to speak, on whether or not the Teamsters will become the representative. But if the Teamsters do, in fact, collect cards from 50% plus one, all Uber or Lyft drivers will be subjected to Teamsters representation, including those who are not eligible to sign a card or be part of the card check process. And what aspect of the ordinance do you cite for that effect? The ordinance, does it say that people who are not qualified drivers under the ordinance are likewise bound by this determination? The definition of exclusive driver representative, Your Honor, which is at 310.110, which is a designated and exclusive driver representative is an organization certified to be the sole and exclusive representative of all drivers operating within the city for a particular driver coordinator. Okay, but drivers, I guess what I'm struggling with, drivers is the defined term, right? Yes. And if your two clients aren't drivers, then how are they bound by this ordinance, assuming that the Teamsters are certified and represent the others? Because the certification, if a union is certified, they become the representative of all drivers, not just qualified drivers. So qualified drivers is just a limited subset that's eligible to participate or be subjected to, I should say, the card check campaign. Because it's a moving target with drivers coming in and out, you know, who are driving for Uber and Lyft, the city has decided to limit who is eligible to sign cards or be part of that voting pool to what it calls a qualified driver, which is drivers who drove so many rides within a certain one-year period. Well, would that be the equivalent of the bargaining unit? The bargaining unit would be all drivers operating within the city for a particular driver coordinator. So, for example, if Uber was unionized and I became an Uber driver the next day, I'm in the bargaining unit, even if I was never, you know, had any role in the card check process at all. But you may not be qualified, even though you are in the bargaining unit? That's right. Qualified driver only affects who's part of that card check process. So in order for a union to become an exclusive driver representative, it needs to collect cards from 50 percent plus one of what the city terms a qualified driver, which is a very limited subset of all drivers. And so if the union is able to get that, then the driver coordinator, let's just say Uber, is in turn compelled to recognize that union as being the representative of all drivers with which it does business in the city. You mentioned that the population that would have people in the bargaining unit comes in and out. Is there a provision in the ordinance for decertification of the unit? Yes, there is, Your Honor. Okay. And that would be, again, a card check? Would they have an election, or how would that work? It's a card check, Your Honor, also. However, I don't believe the decertification process takes away the sting of what is the 8B4 and 8E conduct being regulated by this ordinance, which, again, is the idea of coercing a particular employer, here it would be Uber or Lyft, to agree to only do business with contractors subject to that union's representation. That is quite simply an almost typical type of Teamster hot cargo agreement. So we've cited 11 cases in our brief. They're on page 19 of the opening brief, which involve that very type of conduct. The Teamsters went to a company, usually a construction company, and tried to coerce them or got them to agree to only do business with independent drivers, usually it was truck drivers, who the Teamsters represented or who were subject to the Teamsters' contract. And the board and the court, including this court and Teamsters Local 38, held that to violate Section 8B4 or Section 8E. And so what the drivers are saying here is if you look at the ordinance, what it's really doing is creating a process for what is otherwise a rather typical example of a Teamster secondary campaign under 8B4. I don't follow that analogy because I think typically what you would have is the Teamster going to an employer who they represent their employees and say, don't do business with someone else we're trying to organize. Trying to put pressure on the current employer not to do business with a future or the target of the organizing event. So that's what I'm missing here is what is the, in order to have a secondary boycott, you have to have a primary target. And that's what I'm not quite following. The primary target are the drivers. And the company they're coercing to only do business, to impose the union on those drivers, are driver coordinators, Uber and Lyft. So what the ordinance regulates is to allow the Teamsters to compel Uber or Lyft or another driver coordinator to in turn impose union representation as a condition of doing business on independent drivers. And it's very much like, again, what you see or saw in the construction industry before most of that was stamped out by 8B4 or 8E. The Teamsters would go to a construction company and say, we want you to agree that all independent owner operator drivers you do business with have to accept the Teamsters contract and have to be represented by the Teamsters. That was considered an 8B4 violation. Probably the most direct case is this Court's decision in Teamsters Local 38. In that case, this Court held unlawful under 80 a Teamster agreement that said all certain hauling work done by the employer, quote, must be performed by persons operating under a collective bargaining agreement of the local Teamster union. Now that presumes, of course, that the drivers are cover, that under the National Labor Relations Act, the drivers will be employees in order to be covered by the hot cargo provision, wouldn't it? The exact opposite. They have to be independent contractors for that to 8B4 and 8E to apply. Because 8B4 and 8E apply to when you cease doing business with any other person. So you need a legally separate person in a business relationship. If they're employees, it doesn't apply. So in many of the hot cargo cases, they actually hinge on whether or not the independent drivers were employees or independent contractors. If they were employees, 8B4 and 8E wouldn't apply to them. They'd be just like any other employees a union's trying to organize. But if they're independent contractors, then they're a separate organization by definition or separate entity. And there's a business relationship. And therefore, it became an 8B4 and 8E violation. And that's why many of those cases, again, hinged on that determination. Now here, of course, if Uber or Lyft drivers truly are employees, the ordinance is preempted for the reasons stated in the Chamber case under the Garmin Doctrine. But what we're saying here is that if they're independent contractors, then what you have here is regulation of a rather straightforward 8B4 or 8E situation. And even if this court were to think or believe or find, as the city argues, that this is a type of campaign permitted under Section 8B4 or 8E, pursuant to cases, shipment and production workers. And those cases involved union picketing on behalf of independent drivers to pressure a company with which they were doing contracting. And this court and another held that was primary activity permitted under 8B4. Now, I submit those cases are distinguishable because there was an organizing objective there. But even to the extent this was considered a primary activity under 8B4, the ordinance is still preempted. Because the city of Seattle cannot regulate conduct permitted under Section 8B4 and 8E any more than it could conduct that's arguably prohibited. And the case directly on point there is Teamster v. Morton, where the court held, Supreme Court, that the NLRA preempted application of a state law to Teamster conduct that was actually permitted by the statute. So either way you cut it, whether the conduct authorized by the ordinance is illegal under 8B4 or arguably illegal, which I think it certainly is, or is permitted primary activity, either way the ordinance is preempted. I see I'm getting very close to my rebuttal time, so unless there's a question, I believe I'll reserve it instead of eating into it. Thank you. Good morning, counsel. Good morning. Casey Pitts for the city of Seattle and the appellees. The National Labor Relations Act excludes independent contractors from its coverage and leaves the regulation of their labor relations to State and local governments. Here ---- Well, how do you arrive at that? I arrive at that under the Supreme Court's case in Beasley, which considers the situation ---- That's a supervisor case, right? It's a supervisor's case. And the court there realized that where ---- Well, in that case the court found preemption of the regulation of supervisors specifically because the National Labor Relations Act has statutory text addressing the preemption of State and local regulation of supervisorial labor relations. And there's no such text here. And this court in the United Farm Workers case has held that in the absence of that kind of statutory text, the courts must presume that Congress intended to leave the labor relations at issue to the parties at issue. And here all of the parties to both sides of this case, and indeed all of the parties to both this case and the chamber case, take the position that the drivers at issue here are independent contractors, meaning they fall outside of the National Labor Relations Act coverage. The city of Seattle ---- In 1947, when the Taft-Hartley Act was enacted, it treated supervisors and independent contractors and railway employees the same way, and they said they were not to be covered. So aren't they in a sense ---- Did the Taft-Hartley Act determine that there was going to be no coverage either by the Federal or by the State of independent contractors the same way as it determined that it would not be for supervisors? It did not. The Taft-Hartley Act determined that there would be no Federal coverage, and indeed that there was no need for a Federal law governing labor relations of independent contractors. But the Congress chose not to specifically preempt the labor relations of independent contractors, and it did that in the same act with respect to supervisors. And that's dispositive. And this Court's ruling in United Farm Workers makes it clear that we're entirely outside the box of the NLRA here. Here, the city of Seattle, exercising that authority, created a system of exclusive representation that is identical in all the respects that are being challenged by the plaintiffs to the system that exists under the National Relations Act or the systems that govern other categories of excluded workers under State laws governing agricultural workers and public employees. What particular act or acts did the city ape in this particular case? Well, as far as I'm aware, nearly every State law governing agricultural employees or public employees and the National Labor Relations Act contains a system of exclusive representation, which is all that is at issue here. There's a process for a majority of the particular group. I get that. I thought you said that there are all these laws that did this, and I'm wondering whether you followed any particular law. In other words, did you say, oh, I like this law. This is great. Let's follow that. The city of Seattle. The city of Seattle, yeah. As far as I know, certainly I happen to know California law well, and I know that the California Agricultural Labor Relations Act and the Myers-Millis-Brown Act governing county employees in the State of California has a system of exclusive representation. Were they followed? Do you know? Would somebody use that as the model? You know, in what respect? Wordy. The National Labor Relations Act itself contains a system of exclusive representation like that contained in this act. So you can't identify a particular law other than the NLRA? If we're talking about the aspects of exclusive representation, meaning a process for designating an exclusive representative that then engages in bargaining on behalf of all, I would identify those three laws as well as the Massachusetts law governing public employment. I'm not aware in the United States of a system that doesn't contain these features. Let me tell you what I'm looking for. Things build on each other. I had a case recently involving Twitter, and we went back and looked at the Sherman Act and the Clayton Act and the RICO Act to determine what particular words meant because they were presumed to come from the same situation. So what I'm saying is if the City of Seattle were trying to follow these laws, is there a particular law that it followed so that the language of the ordinance, we could look at that and say, okay, this part's been construed before. That'll help us construe what this ordinance means. I'm not aware. It may depend if there's a particular term that's of concern to the court, but I'm not aware of it. As a general matter, I'm not aware. I apologize for that. Why is the ordinance, just because the argument's being made, why is the ordinance not coercive, threatening, or restraining within the meaning of I think it's 8b-4? So there are two problems. There are three problems, I would say, with their theory that the ordinance involves coercion, restraint within the meaning of 8b-4. The first is simply that because we're talking about independent, the labor relations of independent contractors rather than employees, 8b-4 is simply not implicated. That's the holding of the Supreme Court in Jacksonville Terminal, and this Court's holding in both the Pacific Maritime Exchange and ELPA cases. So we're not in a realm that's governed by 8b-4 and 8e to begin with. Second, that 8b-4 and 8e only apply to secondary activity, and this was an issue that was raised earlier. Here, all of the activity covered by that issue is primary. It involves the process through which an exclusive representative negotiates terms and conditions that will govern all the members of a bargaining unit, to use Your Honor's language earlier. So you don't think that the drivers are the secondary folks in this particular setting? In other words, from my perspective, you've got what turned out to be the union, you've got Uber or Lyft, and then you've got the independent drivers. It seems to me that the primary people who are bargaining are Uber and Lyft and the representative of the union in this case. The drivers are the secondary actors. Is that wrong? So I do believe that in this case, which involves the terms and conditions that Uber and Lyft will apply to its drivers, all of the parties are primary parties. The Supreme Court has made it clear. With respect to these drivers, and perhaps I don't understand how this is going to operate, I'm not aware that the drivers have to be involved in the negotiation process. I thought that the union is going to, in quotes, represent them, and then Lyft will represent its interest, presumably, or maybe the drivers or whatever. But the drivers are going to get what they're going to get, but they're not involved in the process. Is that right? The drivers are represented through their designated representative, which is the representative that a majority of the qualifying drivers have designated. And the rules also require that those entities have a process for driver participation. So there is a requirement that that entity not simply act contrary to driver interest. It is represented. Is that in the ordinance? Yes, that's in the ordinance. And what section is that? I believe it's in the definition of qualifying driver. I would say qualifying driver representative, Your Honor. So the Supreme Court's decision in national woodwork manufacturers makes it clear that the fact that the conduct at issue involves both an employer or an entity that's contracting with others and a union that represents some of those individuals and others who will be subject to what is at issue doesn't mean that there is any secondary party involved. Have organizations other than unions expressed interest in or implied to become exclusive driver representatives? At this time, Teamsters Local 117 is the only entity that has applied and that did apply before the law was enjoined pending further. Did the Teamsters play any role at all in the drafting of the ordinance? As a number of parties were involved in the process. Aren't you answering my question? Did they play any role? I believe they did, like Uber and Lyft as well were part of that process. Kind of like Washington. What's that? Kind of like it goes in Washington. Exactly. So there are parties involved. Certainly there are specific findings that the city council made justifying the ordinance at issue here. No one has been certified yet. No. And it is possible that they would not get 50% plus one. So is this ripe for consideration now or should we wait to see if there is in fact an exclusive bargaining agent certified? This case is not yet ripe. All of the harms that they are complaining about under both 8B4 and 8E are harms that can only occur if an entity is certified as an exclusive driver representative. Exclusive information. I mean, that's a theory. The ordinance is already in place. The ordinance is in place. Driver coordinators have been, if the stay is lifted, will be required to release the names of the qualifying drivers. Have they done that? Has that happened yet? It has not because of the ‑‑ So what has happened as of now? The implementing regulations have issued. The Local 117 requested certification as a qualifying driver representative. And that happened. And that's all that's happened. What else has to happen before the case is ripe? An exclusive ‑‑ a qualifying driver representative that's been certified has to succeed in getting support from 50%. They would have to get the information. They would get the information. They would have to succeed in getting support from a majority of the individuals named on the list. And the director of the city would have to identify ‑‑ have to certify that group as an exclusive driver representative for the particular driver coordinator that the plaintiffs here operate for, here at Uber and Lyft. Until that point, there's no obligation to ‑‑ there's no obligation to negotiate with the exclusive driver representative. There's nothing that can be even arguably construed as a cease‑doing business objective. The plaintiffs ‑‑ Is that the key then, when the exclusive driver representative is selected, then the case is ripe? I think at that point, they would have ‑‑ the case would at least arguably ripe. I think that Section 8e obviously turns on the existence of an agreement. And there will not be an agreement even at the point of that point. But there would at least be some obligation to negotiate towards such an agreement at that point. So the case is ‑‑ Has any form of agreement already been produced? No.  No. The parties have not, because this deal has been ‑‑ No, I know we haven't met, but I'm talking informally. Has one been proposed? I don't believe so. I don't believe so. Nobody's talked to the director in advance to kind of say, this is a good one. Not to my awareness, Your Honor. I want to be clear, though, that the theory that this involves secondary conduct, as they just said, it turns on their notion that there are independent contractors here and that that somehow makes ‑‑ distinguishes this from every other case, recognizing that the negotiations on behalf of a group, a bargaining unit, with the entity that contracts with them or employs them is primary activity. They say that none of those cases apply here, simply because the drivers are independent contractors rather than employees. And that's a position that has been specifically rejected by both this Court and by the D.C. Circuit in the shipment freight services case in this Court and in the production workers case in the D.C. Circuit. Both of those cases say what determines whether conduct is primary or secondary is not whether the individuals at issue are independent contractors or employees, but whether it targets a secondary rather than a primary. Here, all of the conduct we're talking about now, in the process of gathering support for a majority representative, or in the future if it happens that an entity is certified as the exclusive driver representative, it all involves primary parties. It involves Uber or Lyft or some other driver coordinator. It may be that someone else ends up being the target of some campaign or some effort to procure support. All that it involves is those entities and the terms that they choose to apply or that they will apply to all of the individuals in the so-called bargaining unit, all of the individuals doing the exact same work for that driver coordinator. That's quintessential primary activity. It is the activity required under every system of labor relations in the United States. Kennedy. Counsel, can we decide NLRA preemption based on garment or machinists, given the fact this case is not ripe, according to your perspective? I do think it is appropriate for this Court to consider the merits as well as the ripeness issue. I think as the Court below did in considering both issues, the issues are well presented to this Court for resolution, and I think that it will aid both any subsequent reviewing court as well as the lower courts, should there be issues in the future for the Court to resolve both issues, given that they've been well. The ripeness should have no impact on our ability to decide the merits. I believe that my understanding is that the Court has the ability to consider the merits. Now, whether if down the road we have a fight about whether that constitutes Dick Dunner or not, that could be something that the parties could find. But my understanding is that it's within the Court's authority. It's part of the decision below, and it's certainly an alternative basis for the decision below. And I do think it would be of assistance to both reviewing courts and the lower courts to resolve those issues. The one point I want to — I'm not sure I've adequately addressed Judge Mergia's question. So I want to make it clear, too, that to the extent they're contending that right now there is a campaign of some kind that is subject to — that involves coercion for purposes of 8b-4, that is not the case. Right now, all that happens before any exclusive driver representative is certified is that a driver coordinator has an obligation to turn over a list of names and to not interfere with the rights of its drivers to make whatever choice they might make in that process. So there is nothing that is being coerced, even if — and they haven't cited a single case that says compliance with a government regulatory mandate constitutes economic coercion of the sort subject to 8b-4. But even if that were not — Well, then they're forced to make a decision whether to sign or not to sign. And in a sense, this is an open process. In a sense, you're requiring to publicly declare whether they are in favor or opposed to this particular arrangement. Isn't that coercive? It's not coercive. It's very clear that for purposes of 8b-4, the types of conduct that constitute coercion are not mere persuasion. It's actually very clear that persuasion, the act of trying to persuade people, even secondary persuasion — They have it. It's not just persuading them. Then the driver has to either sign the card or decline to sign the card. So it does force them to make that decision. Right. But coercion involves — for there to be coercion, there would have to be an effort to boycott a particular driver. There would have to be forms of threats. I mean, the quintessential version would be making threats, if you don't do this, that we will — you know, that is what 8b-4 talks about when it talks about coercion. Here, none of the requirements that the city has imposed has any effect on who Uber or Lyft at this point are doing business with. They remain totally free to do business with whomever they want. All right. Now we have an injunction in place, right? So everything's kind of on hold? Or is that not correct? I'm sorry. Even in the absence of an injunction, before there's an exclusive driver representative certified, there is no — the ordinance itself doesn't require anything during that period that could be described as coercion, such that the plaintiffs are somehow subject to an 8b-4 campaign that's arguably subject to 8b-4 at this point, which would make — making their claims right, which is their core claim. I think the court seems to recognize that under Davis v. FEC, the mere disclosure of these driver lists doesn't give them standing to challenge the exclusive representative process itself. I think — thank you very much. I can't remember — will the clerk determine — do these folks have any rebuttal time left or — Yes. Okay. I thought so. Okay. Thank you, Your Honor. I'd like to start with rightness and coercion, which is where the questioning left off. The case is right because, other than for this court's injunction, the drivers would be subject to a course of campaign under Section 8b-4. So Section 8b-4 makes it unlawful — But, counsel, right now, with an injunction in place, why is this case right? Because — but for the injunction, the campaign would begin. So when the district court's injunction was lifted, the city gave Uber and Lyft five days until the campaign actually began to turn over the lists. Aren't those lists already public? Are the names already public? In terms of all of the drivers? The drivers. Perhaps I read the record wrong. I thought somebody indicated that those — that information was already public. No, there was an issue below that there is a public list of all four hired drivers in the city. But in terms of a disclosure by Uber or Lyft — No, no, I understand that. But the information that would be in those lists was already out there. Is that wrong? Not to my knowledge, Your Honor. Okay. That has not been disclosed. But in terms of ripeness, it's the coercive campaign against Uber and Lyft to, in turn, impose the union on the independent drivers. That is the coercion, and that is the coercive authority. So it's not coercion on the drivers. It's coercion on the future employer or the driver coordinator. The secondary party. And I think sort of an example may make this very clear. Assume — ignore the ordinance for a minute. Assume the Teamsters, using their own means, like picketing and boycotts, tried to pressure Uber to enter into an agreement whereby they said, we'll only do business with drivers who accept the Teamsters' representation and contract. That's a rather clear AP4 campaign. The picketing is against Uber. It's against the secondary party to, in turn, get that company to impose the union on the drivers as a condition of doing business. That's the way a secondary campaign works. What the ordinance does is give the Teamsters or any other organization that attempts to use the ordinance legal authority to compel that result. So instead of having to use picketing or things to that effect, the Teamsters can use the authority of the city's statutes to impose that kind of pressure. Let me ask you this. Since there is an injunction, in effect, and these things that you talk about may or may not occur, so were we to rule on the Garman and McInnes issues, would that not just be dicta? In other words, we don't have a case that's ripe at this point. Nothing's happened that would qualify here, right? If my understanding is correct from your question, if the preliminary injunction became a permanent one that was issued in the Chamber case, yes. Because the ordinance would be – then you would have some actual on-the-ground results. But until that occurs, even while the preliminary injunction is in effect, where is the – how do we get there, basically, other than just philosophizing? Well, it becomes a question of timing of how long does that preliminary injunction last. So let's say, for example, if this court were to dissolve it in three months, which hopefully it will not, but if it did, I don't believe it should dismiss this case because then we're right back to where we started. In other words, we have two parallel cases right now, one of which has a preliminary injunction issued into it. I don't think it's fair to say ours is not ripe because, so far in the Chamber's case, they've obtained temporary relief. If that were to become – You already had this sort of thing before. You had an injunction and the district court dissolved the injunction, then the Chamber moved forward. You move forward when you have something that's occurred. And that's what I'm struggling with in your case. I get your argument, but I wonder how it's ripe. And if it's not ripe, how can we decide the merits and have it be anything other than philosophizing? I think it becomes, again, a question of timing with this Court's other decision on whether or not – because obviously these cases will be decided more or less the same time. If the Court were to, say, dissolve the injunction in the Chamber case, then our case would be ripe right then. So I don't think it would make much sense to decide our case, say it's not ripe, and then the next day, if the injunction was dissolved. No, again, hopefully that injunction stays in place. So if that injunction were to become permanent in the Chamber case, then Your Honor certainly has a point of the harm we're threatened by would not happen until that injunction is lifted. So it becomes a question of timing as to how this Court decides the two parallel cases. I see about 15 seconds, so – I actually don't have any here over time now, but let me ask my colleagues if there are any other questions we have. No, thank you. Thank you all for your argument. We appreciate it very much. The case just argued is submitted.
judges: M. Smith, Murguia, Robreno